UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                      Case No. 3:13cr49/MCR

MICHAEL FRANCIS FOUNTAIN, JR.,

    Defendant.

_____/

### ORDER ON MOTION TO SUPPRESS

On May 25, 2013, Defendant Michael Francis Fountain, Jr. was charged in a one-count indictment with being a felon in possession of a firearm, namely, a Rossi .357 caliber revolver. *See* 18 U.S.C. § 922(g)(1); 924(a)(2). Defendant Fountain moves to suppress all evidence seized as a result of his contact with law enforcement officers and the search of his yard on January 29, 2013 (doc. 29), which led to his arrest. Fountain argues that there was no reasonable suspicion for the law enforcement officers to stop and search him and that the officers' warrantless search of the curtilage of his home without consent violated the Fourth Amendment. The court conducted an evidentiary hearing on September 6, 2013.

**Background**

At the hearing, Agent Wendy Woolcock of the Drug Enforcement Administration, testified that on the evening of January 29, 2013, she responded to a call that there had been a shooting at a home located at 50 Fulton Avenue in Pensacola, Florida, and that narcotics and other drug paraphernalia had been found at the scene.[1] As she was driving to this address, she passed the house and had to turn around. As she did, the lights of her

---

[1] The call to Agent Woolcock was made approximately two hours after the shooting had occurred.

vehicle shined on a black male standing at the end of the driveway of 107 Fulton Avenue, near the street and some garbage cans, holding a large silver revolver in his hand.[2] This location was one block or approximately one-tenth of a mile away from the scene of the shooting. She testified that the gun was pointed toward the ground and she could see it clearly as she drove by. Agent Woolcock was alone and in an unmarked car so she did not stop and instead proceeded to the scene of the shooting at 50 Fulton Avenue and advised a uniformed officer to go back and investigate.

Deputy Joshua Gentry of the Escambia County Sheriff's Office testified that Agent Woolcock told him she had seen a black male wearing a white tank top, dreadlocks, and plaid shorts, and holding a handgun about one block from the shooting scene. Deputy Gentry and Deputy Justin Moore were dispatched to 107 Fulton Avenue to investigate. Deputy Gentry testified he had been told that the suspects for the shooting at 50 Fulton Avenue were thought to be two black males wearing masks and one wearing a blue jumpsuit; Deputy Moore testified by deposition that he was not aware of whether the person Agent Woolcock observed was connected to that shooting but said it was possible given the close proximity. Both officers knew that the investigation into the shooting at 50 Fulton Avenue was still underway. Deputy Moore also testified that he had been warned previously to be careful at the residence located at 107 Fulton Avenue because it was known that the residents were armed and generally unfriendly toward the Sheriff's Office.

As the officers approached 107 Fulton Avenue, they observed a black male matching the description given by Agent Woolcock and standing in the street beside the garbage cans, who was later determined to be Defendant Fountain. Both Deputy Gentry and Deputy Moore said that when the suspect saw them approaching in the marked police car, he walked back into the yard along the tree line behind the garbage cans; Moore said he walked quickly to the trees. The suspect was momentarily out of the officers' view and then returned to the street. Deputy Gentry testified that he did not see a weapon in the suspect's hands, did not observe the man throw anything, and did not observe any bulge in his pockets. He also testified that the suspect's hands were not in view the whole time.

---

[2] The Government's photographic exhibits show that the garbage cans were located adjacent to the street.

When the officers confronted Fountain, Deputy Gentry immediately handcuffed him and conducted a pat-down search, and Deputy Moore walked to the tree line in the area where Fountain had momentarily gone and saw the revolver lying on the ground in plain view. Deputy Gentry testified that he did not obtain consent to search Fountain and testified that he did not obtain consent for officers to enter the yard. A background check confirmed that Fountain was a convicted felon, and he was arrested.

Deputy Jimmy Wiggins testified at the hearing that he arrived at 107 Fulton Avenue as the suspect was being placed into the patrol car. Deputy Gentry told him the suspect was believed to have thrown a firearm and instructed him to look for it. Wiggins found the gun on the ground by the tree line near a chain link fence.[3] He testified that he did not obtain consent to enter the yard. Deputy Victoria Moore,[4] a crime scene investigator, testified by deposition that when she arrived, two officers were guarding the gun, which she collected as evidence. She estimated that the gun was located in the yard twenty-five feet back from the street near a fence on the west side of the house, approximately twenty-five feet from the house as well, and the gun could not be seen from the road. Agent Woolcock returned to 107 Fulton Avenue after completing her duties at the shooting scene and confirmed independently that Fountain was the man she had seen with the gun and that the gun found also appeared to be the one she had seen him holding.

Ashley Burgess testified for the defense. She resides at 107 Fulton Avenue with Defendant Fountain and their two-year old daughter. She testified that the area to the right of the home to the chain link fence is part of their yard. She added that they use the yard for social gatherings and that her daughter plays there. The photographic exhibits taken on the night of Fountain's arrest show posts in the yard which she testified marked the beginning of a privacy fence Fountain had begun constructing before this incident. Ms. Burgess testified that the posts did not extend all the way to the property line in the photograph because Fountain was not able to finish the fence. A later photograph shows

---

[3] Government exhibits included photographs showing the revolver on the grass near trees along the property line and chain link fence to the right side of the house and driveway, directly behind the garbage cans. The photos also showed trash strewn in the grass nearby.

[4] No relation to Deputy Justin Moore.

another vehicle parked in the general area to the right of the driveway. She admitted that the area where the gun was found is not close to the house and is visible from the street.

**Discussion**

Fountain first argues that he was seized and searched without reasonable suspicion. The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. amend. IV. "Evidence obtained in violation of the Fourth Amendment must be suppressed." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir.), *cert. denied*, 132 S. Ct. 356 (2011). A seizure without consent, reasonable suspicion, or probable cause is unreasonable under the Fourth Amendment. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). A brief *Terry* stop is justified if there is a reasonable suspicion to believe that a crime has been, or is about to be, committed, and the stop was reasonably related in scope to the circumstances that initially justified the interference. *See id.* at 19-20; *Jordan*, 635 F.3d at 1186. "Reasonable suspicion need not involve the observation of illegal conduct, but does require more than just a hunch." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (internal marks omitted).

Determining whether a stop was reasonable under the Fourth Amendment is an objective inquiry that must be based on the totality of the circumstances. *See Whren v. United States*, 517 U.S. 806, 812–13 (1996) (stating the officer's state of mind is not relevant "as long as the circumstances, viewed objectively, justify [the officer's] action" (internal marks omitted)); *see also Lewis*, 674 F.3d at 1304. Also, the Eleventh Circuit and Supreme Court alike state that "although an individual may ultimately be engaged in conduct that is perfectly lawful . . . officers may 'detain the individual to resolve the ambiguity.'" *Lewis*, 674 F.3d at 1304 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)) (internal alteration omitted). The Eleventh Circuit, and Supreme Court, have noted that there is a difference between an investigative stop, for which a reasonable suspicion is enough, and a detention that amounts to an arrest, for which probable cause is required. *United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir.2004) (citing *Dunaway v. New York*, 442 U.S. 200, 209 (1979)). There is no bright line between them; courts must weigh the privacy interests of the individual against the officer's safety. *Id.* at 1146. To determine whether an encounter was an investigative stop or more akin to an arrest, the

court considers four non-exclusive factors: (1) the law enforcement purposes served by the detention, (2) the diligence with which the police pursued the investigation, (3) the scope and intrusiveness of the detention, and (4) the duration of the detention. *Id.* With regard to the first inquiry, "[t]he most important consideration is whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, with a minimum of interference." *Id.* (internal marks omitted). The fact that an officer draws a weapon or handcuffs a suspect does not necessarily lead to a conclusion that the stop has ripened into an arrest. *Id.* at 1147; *see also United States v. Gil*, 204 F.3d 1347, 1350-51 (11th Cir.) (finding a *Terry* stop did not ripen into an arrest where the suspect was handcuffed and detained in the back of a patrol car for seventy-five minutes for the safety of the officers and an ongoing investigation), *cert. denied*, 513 U.S. 951 (2000).

The court finds that the officers' initial encounter with Fountain was not consensual but was an investigatory *Terry* stop because the officers encountered him on the basis of a reasonable suspicion of criminal activity. First, Agent Woolcock observed a black man with a gun standing along the street at the end of the driveway at 107 Fulton Avenue, which was in close vicinity of the shooting incident that occurred approximately two hours earlier.[5] Two black men were suspected of that shooting and had not been apprehended. She gave a detailed description to uniformed officers who immediately drove the one block back to that location in their marked patrol car and saw a man matching the exact description in the same location. Also, when the individual saw the marked patrol vehicle approaching, he walked directly from the street back into the tree line momentarily out of sight; he then returned to the street where the officers stopped him. *See Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). The officers were aware that Agent Woolcock had seen this man holding a gun at the edge of the street, and were aware of the nearby recent shooting, that the two black male suspects had not been apprehended

---

[5] In Florida, it is unlawful for a person "to openly carry on or about his or her person any firearm" unless the person is licensed and only briefly displayed the weapon or openly carried it for lawful self defense. Fla. Stat. § 790.053.

for that shooting, and that the investigation was ongoing. Additionally, Moore had been cautioned previously by other law enforcement officers to be careful at this particular address because the residents were believed to be armed. These circumstances taken together objectively create a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop, regardless of whether or not the officers subjectively believed that this incident was connected to the shooting at 50 Fulton Avenue.[6] *See Lewis*, 674 F.3d at 1304 (noting an objective standard applies).

The court rejects the Defendant's assertion that the possession of a weapon did not provide a reasonable suspicion of criminal activity. Defendant cites *Regalado v. State*, 25 So. 3d 600, 606-07 (Fla. 4th DCA 2010), in which the court concluded that "stopping a person solely on the ground that the individual possesses a gun violates the Fourth Amendment" where "neither the anonymous tip nor the officer's observations revealed any suspicion of past, present, or future criminal activity;" and also *Baptiste v. State*, 995 So. 2d 285 (Fla. 2008) (same). Both cases are materially distinguishable on their facts because the officers there had relied on an anonymous tip that an individual possessed or displayed a gun.[7] Here, by contrast, Agent Woolcock had personally observed Fountain openly carrying a weapon moments before the deputies arrived, which is a violation of Florida law. *See State v Bethel*, 93 So. 3d 410, 413 (Fla. 4th DCA 2012) (citing Fla. Stat.

---

[6] Arguably, the deputies also may have had probable cause to arrest based on Agent Woolcock's observation, minutes before the deputies arrived, of Fountain openly carrying a weapon, which constitutes a misdemeanor under Florida law absent certain exceptions. *See* Fla. Stat. § 790.053. An arrest is justified as constitutionally reasonable if supported by probable cause, which "exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gordon*, 231 F.3d 750, 758 (11th Cir. 2000) (internal marks omitted), *cert. denied*, 531 U.S. 1200 (2001). In *Bethel v. State*, the Florida Fourth District Court of Appeal concluded that an officer had probable cause to enter the curtilage of a home and arrest a man for openly carrying a weapon where he had retreated into the curtilage of his home (a fenced yard) and the officer had observed the butt of a gun protruding out from the defendant's pants pocket, and the officer's observation was made from a place the officer had a right to be. 93 So. 3d 410, 413-14 (Fla. 4th DCA 2012). The Government, however, did not argue that probable cause existed based on Agent Woolcock's observation and report, so the court has no occasion to consider the issue in this case. Moreover, the court finds it is not necessary to consider probable cause because the officers clearly had a reasonable suspicion to justify the stop on this record.

[7] Additionally, the *Regalado* case has been rejected and criticized as contrary to, or distinguishable from, at least two other Florida District Court of Appeal cases. *See United States v. Montague*, No. 10-20368-CR, 2010 WL 3294283, at *2 (S.D. Fla. 2010) (citing cases).

§ 790.053).  Also, in an analogous situation, the Eleventh Circuit has found that a stop was supported by reasonable suspicion where the individual was known to be carrying a concealed weapon, despite the fact that the individual may have a valid affirmative defense of a lawful permit to carry a weapon.  *See Lewis*, 636 F.3d at 1034.  The description from Agent Woolcock left no doubt that the deputies were encountering the same person she had seen from her vehicle openly carrying a weapon only minutes before.  On this record, the totality of the circumstances demonstrates that the officers had a reasonable suspicion to briefly detain while they searched for the weapon and determined whether it was lawfully possessed.

Also, the court finds that, considering the four nonexclusive factors listed by the Eleventh Circuit in *Acosta*, the stop was not elevated to an arrest until after it was determined that Fountain was a convicted felon.  First, the law enforcement purpose served by the detention was for the protection of the officers and the public–there was a nearby shooting only two hours earlier with an ongoing investigation and a credible report of a man with a gun at the edge of the street at the very location they found Fountain, who matched the description, so it was reasonable to believe Fountain was armed and their safety was compromised.  Second, the diligence with which the police pursued the investigation was swift and specific–they handcuffed him, searched his person, and when the gun was not found, they immediately located the gun in the place they reasonably assumed he had thrown it when he momentarily stepped out of their sight as they approached; and the officers then confirmed he was a convicted felon and placed him under arrest without delay.  Third, the scope and intrusiveness of the detention was brief and limited–although Fountain was searched and handcuffed, this was a reasonable response to the situation and existing circumstances.  Fourth, the duration of the detention was brief–they found the gun immediately and arrested him after confirming he was a convicted felon.  In sum, the brief search of Fountain's person and detention in handcuffs while the officers located the gun and confirmed Fountain's status as a convicted felon was a reasonable *Terry* stop in light of the totality of the circumstances.  *See Acosta*, 363 F.3d at 1146; *see, e.g., Lewis*, 674 F.3d at 1304 (finding circumstances to be a *Terry* stop when officers drew weapons on individuals and ordered them to sit with their hands up); *Gil*, 204

F.3d at 1350-51 (finding a *Terry* stop although the suspect was handcuffed and detained in the back of a patrol car for seventy-five minutes for the safety of the officers and an ongoing investigation).

Fountain also argues that the warrantless search for the gun in his yard violated his Fourth Amendment rights. The court disagrees. When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). The Supreme Court has recently described the curtilage of the home as "the area immediately surrounding and associated with the home," and reiterated that this area is constitutionally protected. *Id.* (internal marks omitted). The Court further explained, "[t]his area around the home is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened." *Id.* (internal marks omitted) (finding no doubt that officers entered the curtilage where they came onto the front porch of a home, an area "to which the activity of home life extends"). However, an officer does not need a warrant to walk onto property that is not within the home's curtilage. *See United States v. Jones*, 132 S. Ct. 945, 953 (2012) (holding that a government agent's physical intrusion on an area beyond the home's curtilage "is of no Fourth Amendment significance").

A search of a protected area such as the curtilage of a home is justified if supported by probable cause and a warrant. A "warrantless search is 'presumptively unreasonable'" but is permitted where "both probable cause and exigent circumstances exist." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991), *cert. denied*, 502 U.S. 907 (1991). "Probable cause exists when under the 'totality-of-the-circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal alteration omitted). A sufficient connection between the object and the place to be searched can be established "from the particular circumstances involved and need not rest on direct observation." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (internal marks omitted). Exigent circumstances exist where there is "'compelling need for official action and no time to secure a warrant.'" *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)

(quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)), *cert. denied*, 537 U.S. 1161 (2003). The mere presence of contraband alone does not create exigent circumstances unless there is a danger that evidence will be destroyed or removed or there is a danger to the public or the officers. *See id.* at 1334-35; *see also Tobin*, 923 F.2d at 1510.

Ms. Burgess testified that the area where the gun was found is part of their yard and is where they socialize and where their two-year-old daughter plays. Victoria Moore estimated the distance from the house to the area where the gun was found to be approximately 25 feet. The Government's photographs demonstrate that the gun was found at the very edge of the property across the driveway from the house, past a grassy area strewn with garbage, and very near the chain link fence and tree lined boundary on the west side of the property, directly behind the garbage cans from the street view. *See United States v. Maestas*, 639 F.3d 1032, 1040 (10th Cir. 2011) (stating it is difficult to find a reasonable expectation of privacy in an area, or that it is an area reserved for intimate activities of the home, if garbage is regularly stored there). It was out of direct view from the street at night but within plain view of anyone who would have walked between houses along the chain link fenced property line.[8]

The photographs confirm that this area cannot be considered a spot that is intimately linked to the home such that it carried heightened privacy expectations. The court finds on this record that the gun was not within the curtilage. *See United States v. Dunn*, 480 U.S. 294, 302-03 (1987) (requiring consideration of factors such as proximity to the house, enclosure by a fence, indicia that the area is used for "intimate activities of the home," and steps taken to prevent others from observing the area). The court also notes that the posts which Ms. Burgess testified were to be a privacy fence did not appear to encompass the area where the gun was located, and in fact, some of the privacy fence posts show that the fence in progress would have separated the house from the area where the gun was found. A subsequent photograph shows that the privacy fence was not completed and a car was parked in the open space to the right of the driveway. Although

---

[8] The chain link fence did not line the street side of the property, only the border between the adjacent property, and photographs show that another chain link fence separated the back yard from the front, including the area where the gun was located.

the distance from the house to this property line was not great, there is no indication from the photographs that this area was used for any "intimate activities;" the photos actually suggest otherwise. *United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012) (stating the "home's curtilage is the private property immediately adjacent to the home," and it is "treated as the home itself" "if it is used for intimate activities of the home" (internal marks omitted)), *cert. denied*, 133 S. Ct. 957 (2013).

Even assuming this area was within the curtilage, both probable cause and exigent circumstances justified the search. Again, Agent Woolcock had seen Fountain openly holding a weapon, and the officers saw him walk directly to the tree lined boundary of the yard, momentarily out of sight, when he saw them approach in a marked police vehicle. This created a fair probability that a gun would be found in that location. Also, the circumstances presented an obvious public safety risk – the gun was along the property line in a residential area not far from the public street and thus posed a danger to officers and the public, especially in the context here where a shooting had recently occurred nearby, an investigation was underway but the suspects of that crime had not been apprehended, and at the time of the search, the officers did not yet know whether Fountain might have been involved in the nearby shooting, which was unquestionably a violent offense. *See Hearn v. Fla.*, 410 F. App'x 268, 271 (11th Cir. 2011)[9] (finding officers had probable cause and exigent circumstances to justify entering private property). The court finds that exigent circumstances supported the officer's brief entry onto the yard along the property line to locate the gun. *See Bethel*, 93 So. 3d at 414.

Accordingly, Defendant's Motion to Suppress (doc. 29) is **DENIED**.

**DONE and ORDERED on this 10th day of September, 2013.**

                *s/ M. Casey Rodgers*
                **M. CASEY RODGERS**
                **CHIEF UNITED STATES DISTRICT JUDGE**

---

[9] While unpublished opinions are not considered binding, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).